Filed 2/20/25  P. v. Madrigal CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDDIE MADRIGAL et al.,<br><br>    Defendants and Appellants. | B328591<br><br>(Los Angeles County<br>Super. Ct. No. PA091645) |

APPEALS from judgments of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed as to appellant Eddie Madrigal.  Affirmed in part, conditionally reversed in part, and remanded with directions as to appellant Mario Joseph Garcia.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Eddie Madrigal.

Brad Kaiserman for Defendant and Appellant Mario Garcia.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Eddie Madrigal and Mario Joseph Garcia appeal from judgments entered after a jury found each of them guilty of first degree murder. The jury also found Madrigal guilty of possession of a firearm by a felon. As to both defendants, on the murder count, the jury found true the allegation that a principal personally and intentionally discharged a firearm, which proximately caused great bodily injury or death. The jury also found true the allegation that Garcia personally and intentionally discharged a firearm, which proximately caused great bodily injury or death. The trial court sentenced Madrigal to 25 years to life and Garcia to 50 years to life in state prison.

Garcia contends his trial counsel's inappropriate conduct resulted in the deprivation of his right to counsel, ineffective assistance of counsel, violation of his Sixth Amendment right to make fundamental choices about his defense, and violation of his constitutional rights to an impartial jury and a fair trial. He challenges the firearm enhancement, arguing it is not supported by sufficient evidence and the trial court should have dismissed it under Penal Code[1] section 1385. He also challenges the trial court's denial of his petition to disclose juror contact information, arguing he made a prima facie showing of good cause for the release of such information so he could investigate claims about his trial counsel's conduct. We agree with Garcia that the trial court erred in finding that he had not made a prima facia showing required by Code of Civil Procedure section 237,

_____

[1] Undesignated statutory references are to the Penal Code.

2

subdivision (b), but we disagree that making a prima facia showing is sufficient to entitle him to juror contact information. Rather, there are two more hurdles he must overcome to be entitled to such information. Accordingly, we remand for further proceedings pursuant to Code of Civil Procedure section 237. We reject Garcia's other contentions of error.

Madrigal contends the trial court erred in admitting statements Garcia made to an undercover agent during a jailhouse operation that incriminated him. He also contends the court violated his confrontation rights under the Sixth Amendment when it admitted statements Garcia made to detectives, arguing the statements were facially incriminating against him. His final contention is that his trial counsel rendered ineffective assistance when he did not move to bifurcate the two charges against him. As explained below, we have no cause to disturb the judgment against Madrigal.

## BACKGROUND

In September 2018, Ricardo Diaz was killed by gunfire on San Fernando Road in the San Fernando Valley area of Los Angeles. Madrigal and Garcia's trial for the offenses referenced above commenced in April 2022.

A.      **Prosecution Evidence**

1.      ***Eyewitness testimony regarding the shooting***

Shortly before 6:30 p.m., on September 6, 2018, Maria Elena Reynaga de Fausto was inside her house, located near the intersection of San Fernando Road and Nurmi Street. She looked outside and observed a man standing by the wall of an alley running parallel to Nurmi Street. He was talking on a cell

3

phone.  She could not see his face because the hood of his gray sweatshirt was covering it.  She watched him for 20 to 30 seconds and then turned away.

Not long after, she went outside to the front of her house and observed the man standing by the fence line of her property.  She walked back inside and went to the kitchen.  As she started to prepare food, she heard what sounded like a series of fireworks.  She looked out her living room window to San Fernando Road and observed the same man standing across the street from her house.  She also observed a car parked directly in front of her house, next to the sidewalk, which appeared to be gray.  She saw the man reach inside his sweatshirt, and she turned away.  Then, she heard more of the same sounds, and again thought they were firecrackers.  Her children told her not to go outside because the sounds were gunshots, not fireworks.  Around a week later, police officers interviewed her about the incident.

When the shooting at issue occurred, Alfieri Belli was at a taco stand near the intersection of San Fernando Road and Polk Street (a block away from Nurmi Street).  He heard gunshots, and he crouched down.  After a series of around four shots, he stood up on the trailer of the taco stand.  He looked across some railroad tracks toward San Fernando Road and observed a man in a sweater with the hood pulled over his head, standing in front of the alley adjacent to Nurmi Street.  Belli saw the man fire a gun, begin to run up the alley, and then turn around and fire more shots at the victim.  Belli heard around five shots in this second series of gunshots.  The man continued up the alley and disappeared from Belli's view when he "cut" to the left near a white wall in the alley.  During the incident, Belli observed a

4

dark-colored vehicle (perhaps black or blue) make a right turn onto Nurmi Street from San Fernando Road. He testified at trial that he did not see anyone fire a gun from the car or exit or enter the car.

Minutes after the shooting, Belli went to the scene and reported what he observed to law enforcement. At trial, the prosecutor played an audio recording of that interview. Belli told the officers that he thought the now deceased man, later identified as Diaz, was walking when a car pulled up and a man exited. Belli reported that he believed Diaz fired a gun first,[2] and the man returned fire, before running up the alley and turning into a house just past a white wall on the left. Belli also reported that he heard two sets of gunshots that came from different guns. He described the shooter who fled as Hispanic, "young" (between 19 and 23 years old), "real skinny," about 130 to 140 pounds, and around 5 feet 9 or 10 inches tall; the man was wearing a gray hooded sweater and possibly a black baseball hat, with his face covered. After the unidentified man started shooting, Belli observed that the car "sped off" and made a right turn. He believed the car might have been black.

At around 6:30 p.m. on September 6, 2018, Penny Garcia (who is not a relative of defendant Garcia) was driving a vehicle on Nurmi Street, heading toward San Fernando Road. She stopped at a stop sign and saw a sedan parked in the middle of the road with someone in the driver's seat. She observed a man walking, and another man (not the driver of the car) shot him in the back multiple times. The shooter started to leave, then turned around and fired more shots at the victim before leaving

---

[2] Law enforcement did not find a gun at the scene.

5

the area. She saw the victim fall to the ground. She also saw the sedan drive up Nurmi Street. She testified at trial that she did not recall seeing anyone exit the sedan.

She dialed 9-1-1 and reported the shooting. At trial, the prosecutor played an audio recording of the call. During the 9-1-1 call, she reported that two Hispanic men shot another man. One of the suspects exited a 4-door black car before firing; the other suspect remained in the car. The suspect on foot, who had a handgun, fired on the victim, started to go back to the car, and then turned and fired more shots. The car drove away and turned onto Nurmi Street.

### 2. *Law enforcement's investigation*

When officers arrived at the scene, there were two males and a female standing close to Diaz's body; one of the males walked away from the scene. All three were identified by law enforcement, and none was deemed a suspect. There was no gun found near Diaz's body.

Paramedics pronounced Diaz dead at the scene. He had a faded "P" tattoo on his face, indicating he had been affiliated with the Pacoima street gang. He also had a "25" tattoo, indicating he had dropped out of a street gang and joined a prison gang. An autopsy determined Diaz died from multiple gunshot wounds. Five of the six entry wounds were on the back of his body. He lived within walking distance of the scene, and he was walking in that direction at the time of his death.

Police officers recovered seven .45-caliber cartridge cases and three nine-millimeter cartridge cases at the scene. The .45-caliber cartridge cases were closer to Diaz's body than the nine-

6

millimeter cartridge cases.[3]  A detective testified that a 45-caliber gunshot is much louder than a nine-millimeter gunshot.  The prosecution did not present evidence indicating the caliber of bullets that caused Diaz's gunshot wounds.

Detectives obtained surveillance videos from houses on Nurmi Street.  A surveillance camera captured a dark-colored vehicle traveling at a high rate of speed eastbound on Nurmi Street, in the same direction eyewitnesses reported seeing a dark-colored vehicle leave the scene of the shooting.  Using still shots from the video, a detective was able to identify the vehicle as a 2006-2010 Lexus, model 250 or 350.  The car had unique dark black wheels with "a silver cap to them" and distinct damage over the front left fender.

On September 24, 2018, 18 days after the shooting, detectives located a Lexus parked on Polk Street (three to four blocks away from the crime scene), that matched the make, model, and front left fender damage of the vehicle on the surveillance video.  The detectives observed a man (later identified as 26-year-old Madrigal) and a woman exit a house on Polk Street.  They entered the Lexus, and Madrigal drove the car away.  The detectives and additional officers initiated a traffic stop, and Madrigal was taken into custody.  In the back seat of the vehicle, officers found a sweatshirt with an "SF" logo on it, a logo typically used by the San Fer street gang.  The officers also recovered a cell phone from the center console.

---

[3] The prosecution's theory of the case, as argued to the jury, was that Madrigal exited his car, fired shots from a nine-millimeter gun, and got back in his car; then Garcia fired shots from a .45-caliber gun.  The jury was not asked to make a finding as to whether Madrigal personally discharged a firearm.

Detectives executed a search warrant at the house on Polk Street where they had observed Madrigal. They determined he had "dominion and control of" a room in the back of the residence (a detached structure). From that room, detectives recovered a .380-caliber pistol, a box of .38-caliber ammunition, a blanket with an "SF" logo on it, and apparel typically worn by San Fer gang members. From the bathroom in the room, they recovered a rifle.[4] Officers also found "a bag of narcotics and some cash" in a dresser.

### 3. Madrigal's statements during an interview with detectives and during a subsequent Perkins operation

On September 24, 2018, the same day as Madrigal's arrest, detectives interviewed him at a police station. At trial, the prosecutor played portions of a video recording of the interview. Madrigal stated he had been living at the house on Polk Street since early 2018, and he had acquired the Lexus from his cousin several months before his arrest. The detectives told him a car similar to his was seen in the area of a homicide that occurred a couple of weeks earlier near his house. They asked him if they would find evidence of the crime in his car, such as gunshot residue, casings, or blood. He said no. Later in the interview, they told him they knew his car was at the scene of the homicide because the car was captured on video and they had positively identified it. Madrigal denied his car was there. He also denied that anyone used his car on the night of September 6, 2018, when the shooting at issue occurred. The detectives asked him about

---

[4] The firearms and ammunition found in Madrigal's room did not match the caliber of the casings found at the scene of the shooting.

items found at his house that indicated he was an active member of "San Fer." Madrigal stated he did not "gang bang."

The following day, on September 25, 2018, law enforcement conducted a *Perkins* operation[5] in the cell where Madrigal was being held. The conversation between the undercover agent (an older male) and Madrigal was video and audio recorded, and the prosecutor played a redacted version of the audio recording at trial. Madrigal introduced himself to the agent as "Kiko" from "San Fer." As the two men conversed about the nature of their arrests, Madrigal stated that the police told him his car was seen on a recording from a house camera, but he told the police they did not see his car. The agent asked if the car was impounded, and Madrigal said yes. Madrigal also explained that the police searched his house and found two guns, one of which was "clean" (not used in a crime). The agent indicated Madrigal would be okay "as long as it [the gun] don't match up to nothing with the car."

Madrigal told the agent, "[A]ll they have is the – is a car," then added, "even if they're, if they don't find powder on it, residue." The agent indicated that if a shooting happened "a ways from it [the car], they're not gonna get any residue in it." Madrigal asked, "How about outside," before a detective interrupted the conversation to speak with Madrigal. When the conversation between the *Perkins* agent and Madrigal resumed, Madrigal stated that what led to his arrest is having a "nice car,"

---

[5] In a *Perkins* operation, an undercover law enforcement officer poses as a fellow inmate and engages an incarcerated suspect in conversation that could elicit an incriminating response. *Miranda* warnings are not required. (See *Illinois v. Perkins* (1990) 496 U.S. 292, 294.)

9

a "rare car," a car that "stands out." He explained that he bought the car from his cousin a while ago.

Madrigal told the agent that the shooting occurred in his neighborhood, a couple blocks from his house, where everybody knows him. He stated that he parked his car "on the main street," and indicated that the shooting occurred on a side street near the train tracks. He described the gang rivalries in the area, and explained that his gang had problems with "mostly Pacoima." He told the agent, "[I]t's our valley," and "we . . . press everybody." He indicated that "most times," his gang stayed "right here and these fools [rival gang members] are like way over here." The agent responded that in that case, it was not "worth it" to confront the rival gang members. Madrigal replied, "Unless you really need to[.]"

### 4.    *Cell phone records and social media posts*

Detectives obtained phone records for the cell phone that officers found in Madrigal's car for the timeframe around the September 6, 2018 shooting. The first 9-1-1 call regarding the shooting came in at 6:31 p.m. "and some odd seconds." The cell phone records showed calls between Madrigal's phone number and another number immediately before and shortly after the shooting. Detectives obtained cell phone records for the other phone number and learned that it was associated with 19-year-old Garcia.

The cell phone records showed an outgoing call from Garcia's phone number to Madrigal's number at 6:21 p.m. on September 6, 2018, that lasted 31 seconds. At 6:25 p.m., there was an outgoing call from Madrigal's phone number to Garcia's number that lasted four minutes and 32 seconds. Cell tower evidence showed that when the latter call was made, Madrigal

10

and Garcia were in the same general area where the shooting occurred (an area that also included Madrigal's and Garcia's residences).  In the hours after the shooting, Madrigal's and Garcia's cell phones exchanged multiple phone calls and text messages.

Detectives also obtained records reflecting Madrigal's and Garcia's social media activity on Instagram.  Records from Madrigal's account showed that on the morning following the shooting, someone posted photographs of the crime scene on Instagram and sent the post to multiple recipients, including Madrigal.

Records from Garcia's Instagram account showed that he participated in a group text conversation on the morning following the shooting with multiple recipients, including Madrigal (who used the account name "YoungunnersSF" on Instagram).  Garcia wrote to the group, "Yesterday some fool were dippin in this whip [a car]," and then, "Masked up, shit went bad."  There were accompanying posts with photographs of a car and a screenshot of individuals, one of whom had a large "P" on the side of his face.  Garcia wrote, "Watch for this smack. Been in the hood lately."  Someone else wrote to the group, "Send more flix," and "You follow him[.]"

### 5. *Garcia's arrest and search of his home*

On November 20, 2018, two and a half months after the shooting, Garcia was arrested at his home on Nurmi Street, which was located halfway up the block of Nurmi Street closest to the crime scene.  A fence at the edge of the home's backyard abutted the alley into which eyewitnesses saw a shooter run.  A gate to the backyard was on the left side of the alley, just beyond

11

a white, brick wall (if looking into the alley from Old San Fernando Road).

Officers searched Garcia's home. In a bedroom, they recovered: an AK-47 assault rifle from underneath a bed; a wallet with Garcia's I.D. from the pocket of a pair of jeans next to the AK-47; a .22-caliber rifle from a closet; and an "SF" hat. Officers also recovered from Garcia's home a large tin and a duffel bag full of ammunition: 200 rounds of .45-caliber ammunition, 150 rounds of nine-millimeter ammunition, three nine-millimeter magazines, an AK-47 rifle magazine, in addition to .380- and .40-caliber ammunition. Additional firearms were found at the residence: two .380-caliber handguns and a .357-caliber revolver. None of the firearms recovered from Garcia's home were capable of firing .45-caliber or nine-millimeter ammunition (like the cartridge cases found at the crime scene).

6. ***Garcia's statements during a Perkins operation and a subsequent interview with detectives***

On November 20, 2018, the same day as Garcia's arrest, law enforcement conducted a *Perkins* operation in the cell where Garcia was being held. The conversation between the undercover agent (an older male) and Garcia was video and audio recorded, and the prosecutor played a redacted version of the video and audio recording at trial. Garcia asked the agent, "[W]here are you from, homeboy?" After the agent responded, Garcia introduced himself as "Chief" from "San Fer." Garcia indicated he was not sure why he was arrested. The agent advised him to just listen and not volunteer information when officers interviewed him and to go "pro per" so he could find out what evidence they had against him.

12

Garcia asked the agent, "What if I was sk[i] masked up and everything. I got the burner [firearm]. I dropped it. It's already gone, right?" When the agent inquired further, Garcia confirmed that he "got rid of the burner." The agent told Garcia to make sure he got rid of the ski mask because officers would test it for DNA if they found it. Garcia asked the agent if he would be "good" if officers did not find the ski mask or anything else connected to the crime, and the agent answered affirmatively.

The agent asked Garcia if the crime was gang related and Garcia responded, "Yeah, it was on camera, too" and "happened down the street" from where he lived. Garcia indicated he had not been charged with that crime. He added, "I wasn't even there," and "I had nothing to do with [it]." The agent responded, "Hell, yeah," and "That's what you tell those [officers], homie."

The agent advised Garcia to get rid of the phone he was using at the time of the crime. Garcia told him the officers already had that phone. The agent asked him if the phone was turned off when the crime happened, and Garcia said no. Garcia indicated he was currently wearing the same shoes he was wearing when a camera captured him running at the scene, and he did not know what he should say to the officers about it. The agent told him he should have gotten rid of the shoes. Garcia called himself a fool for not doing so.

Garcia told the agent that the police arrested his "homie" about two weeks after the incident because of his [the "homie's"] car. Garcia then stated, "Yeah [unintelligible], it just happened [unintelligible] homeboy was around the area, that fool, fool was funny, not funny, but just coincidental, fool." He added, "spark homeboy, out of [unintelligible]. Homeboy cut him down." The agent asked if Garcia entered his "homie's" car, and Garcia said

no, he ran away.  The agent stated it could exonerate him that he did not get in the car because officers will "dust" the car.

A detective interrupted the conversation and told Garcia he was being arrested for a murder that happened in September 2018 on San Fernando Road.  The detective stated he would come back to discuss the matter with Garcia.  After the detective left the cell, Garcia and the agent resumed their conversation. Garcia stated, "They're saying I'm being arrested for murder . . . . I didn't do no murder, dog."  Garcia continued to ask the agent for advice and rehearsed what he might say to the detectives (e.g., "I was at the barbershop").

The agent asked Garcia what "the homie" was arrested for and Garcia indicated it was because of his car and because "he was there."  Then he stated, "And that fool got a lawyer right now.  They can't get him for it.  But- . . . He has a prior. . . .  But as of right now, they don't got that on him.  They're trying to." He added, "I'm burned, though."

Garcia asked the agent about the length of a possible prison sentence.  The agent said it depends on the nature of the shooting.  Garcia described the crime as "[b]lasting a fool . . . from a distance."  The agent asked, "Did you hit him on the face or in the body?"  Garcia responded, "the whole shit."  The agent told him the maximum sentence would probably be 20 to 25 years, but he might be able to make a deal for less time if the case against him was weak.  Garcia replied, "But I don't wanna admit to it, you know why?  'Cause they didn't catch me with no burner, and I barely go to the [unintelligible] right there.  And I was ski masked though."

14

Garcia asked the agent what he should say if the detectives "try to bring in [his] prior case." The agent said he did not have to talk about it with the detectives.

After the *Perkins* operation concluded, two detectives interviewed Garcia for two-and-a-half to three hours at the police station. At trial, the prosecutor played video recordings of portions of that interview. A detective informed Garcia that he was at the station because of a homicide that happened on San Fernando Road. Garcia stated that he was aware of it because he heard about it the night it happened, and he knew it was gang related. Initially, he denied being at the scene, and he denied ever being a gang member.

Garcia asked the detectives to tell him what they knew about his involvement in the crime. They said they knew he was a member of "San Fer" (which he denied) and that he lived at a house on Nurmi Street with his family. Garcia acknowledged that he stayed at that home "some nights." When they told him they found guns there and knew they were his, he did not deny it. They told him they knew he was at the scene of the crime based on his shoes and his clothing. He acknowledged he had the same shoes on: "[L]et's say I got the same shoes." But he denied he was wearing the same outfit: "I don't got the same outfit! I don't! I don't got the same outfit on, bro. I don't got the same outfit on."

Garcia admitted to the detectives that he was there: "And so, it's, like, all right, I was there, okay. I didn't- and I'm not gonna say, 'Oh, I didn't shoot him,' 'cause I don't wanna go down for murder or nothing, its just- all right, like you're saying, it's the wrong time, wrong place, you know? Homeboy was already- he's going by. So, it just happened to be that when I was taking off, they- that whole shit caused a . . . homeboy was- he was

15

staying around there and they were just- he was tagging around and that's that."  He added, "[T]hat day I was walking down my alley, that's when . . . that shit went down right there.  And I know you saw me in [*sic*] and that's what it is."

Garcia continued to deny he was a shooter:  "[L]ong story short I was supposed to go take care of some shit and I, um, let homie into hitting me up, this and that, we're gonna kick it, like [unintelligible] this and that, we always kick it anyways.  So, we're gonna kick it and next you know that's when boom!  That shit happened right there.  Old boy was- he's been going around, around that time and it's only common sense.  And when the fucking homeboy just happened to be right there walking, that's when they did their thing.  And, you know, I- it's, like, I can't really say something 'cause you already know, it'll fall back on me, bro.  And, okay, I witnessed that, but it's, like, all right, I witnessed that . . . ."

Garcia indicated to the detectives that Diaz (the decedent) knew where he lived, and "everybody" knew "there's tension in that alley."  Garcia stated, "[H]e just happen to walk by, he was trippin', blah, blah, blah, he pushed off and then, that's when boom, boom, boom, that's it.  There it is.  Just like that.  There it is."  The detectives asked Garcia where the gun was that was used in the crime, and Garcia responded:  "It sucks to say you guys will never find it, bro, you know why?  'Cause it's in the wash, and that's real shit.  It got chucked in the . . . sewer."

The detectives asked Garcia how many times he had "hit up" Diaz before the shooting.  Garcia said he had seen Diaz in the alley before that night, riding a bicycle, but he never said anything to him because he had "seen the P [tattoo] on his face."  Garcia indicated Diaz was not supposed to be in Garcia's

16

neighborhood.  Garcia explained that when he had seen Diaz in the alley before, he thought, " 'Alright, this guy is fucking mobbing around here, you know.' "

### 7. *Additional gang evidence*

A gang enhancement, alleged against Madrigal and Garcia in the information, was bifurcated from the charged offenses and firearm enhancement allegations.  The trial court allowed the prosecution to present gang evidence in connection with the murder count, finding such evidence was relevant to motive.

At the time of his arrest, Madrigal had a tattoo across his back stating "Los Youngsters," which is the name of a "clique" of the San Fer gang.  After his arrest, Madrigal obtained a new tattoo across his torso stating "San Fer."  Photographs posted on Garcia's Instagram account showed Garcia making an "S" gang sign with his hand and wearing apparel with an "SF" logo on it. As noted above, both Madrigal and Garcia introduced themselves as being from "San Fer" during their respective *Perkins* operations.

The prosecution's gang expert (a Los Angeles Police Department Detective) testified that the shooting occurred within territory claimed by the San Fer street gang.  All Pacoima street gangs are rivals of San Fer and "mortal enemies."  According to the expert, whenever a Pacoima gang member is in San Fer territory "it's kill on-site."  In current gang culture, drive-by shootings are prohibited; a gang member must get out of the car and walk up to the victim before shooting them.  The expert also testified that gang tattoos "have to be earned through putting in work," "also known as being involved in a mission, which is committing crimes for the gang," "typically against rival gangs."

## B.    Defense Evidence

Garcia called the sole defense witness, investigator Gregorio Estevane, a gang expert.  Estevane testified that Garcia probably was not a "made trained gang member" at the time of the shooting, based on his lack of gang convictions, gang tattoos, and gang contacts.  Estevane also commented on Garcia "acting in a non-gang manner in cooperating" with the police during his interview by talking to them for three hours.  According to Estevane, someone "so skinny and small" is less likely to be recruited to join a gang; but it is possible someone like that would pretend to be a gang member or pretend to be friends with gang members to fit in if he lives in a gang's claimed territory.

In response to cross-examination by the prosecutor, Estevane testified he was unaware Garcia had a sustained juvenile petition for robbery with gang and firearm enhancement findings.  The prosecutor asked Estevane if knowledge of the sustained petition with enhancement findings would change his opinion on whether Garcia was a gang member.  Estevane responded, "Maybe not yet, but that would be a factor."  The trial court immediately gave a limiting instruction:  "This evidence about Mr. Garcia's prior criminal history has been admitted solely and only as it pertains to and impacts this witness's opinion as to whether or not Mario Garcia is a gang member.  It's been admitted for no other purpose.  You shall not consider that evidence for any other purpose."  Thereafter, Estevane clarified that "at this point," knowledge of the sustained petition with enhancement findings would not change his opinion on whether Garcia was a gang member.  He stated he "would need more."

For purposes of count 2 against Madrigal for possession of a firearm by a felon, Madrigal and the prosecution stipulated

18

before the jury that Madrigal had an August 2011 conviction for possession of a firearm by a felon.

## C.    Verdicts

The jury found Garcia and Madrigal guilty of first degree murder.  (§ 187, subd. (a).)  As to both defendants, on the murder count, the jury found to be true the allegation that a principal personally and intentionally discharged a firearm, which proximately caused great bodily injury or death.  (§ 12022.53, subds. (b)-(e)(1).)  The jury also found to be true the allegation that Garcia personally and intentionally discharged a firearm, which proximately caused great bodily injury or death.  (§ 12022.53, subds. (b)-(d).)  The jury also found Madrigal guilty of possession of a firearm by a felon.

On the date set for the bifurcated trial on the gang enhancement allegations alleged in the information (§ 186.22, subd. (b)(1)(A) & (C)), the prosecution announced it was unable to proceed.  On defendants' motion, the trial court dismissed the allegations.

## D.    Garcia's Petition to Disclose Juror Contact Information and Motion for New Trial

Before sentencing, Garcia substituted new counsel for his trial counsel Lawrence Strauss.  His new counsel filed a petition to disclose juror contact information and a motion for new trial.

In the petition, Garcia argued that in preparation for a motion for new trial, he needed juror contact information to investigate potential claims that Strauss rendered ineffective assistance and that Garcia was deprived of his rights to a fair

trial and an impartial jury because Strauss made improper comments outside the courtroom.

In his motion for new trial, he argued that Strauss's conduct, even without what might be revealed by the jurors, demonstrated violations of his constitutional rights. He raised the following claims: (1) he was deprived of his constitutional right to counsel because Strauss was sleeping and/or distracted (playing games on his cell phone) during critical and substantial portions of the trial; (2) Strauss commented outside the courtroom in front of jurors that Garcia was guilty, violating Garcia's Sixth Amendment right to make fundamental choices about his own defense; (3) Strauss rendered ineffective assistance by calling a gang expert and/or failing to advise the expert about Garcia's juvenile disposition that included a gang allegation; (4) Strauss's conduct in front of the jury deprived Garcia of his constitutional rights to an impartial jury and a fair trial; (5) the errors were cumulatively prejudicial.

### 1. *Strauss's conduct as disclosed by the record of the trial*

During a conference outside the presence of the jury on the second day of trial (April 7, 2022), the court requested that Strauss, "just try to keep it down at counsel table, please." The court added, "You do like to talk, though." Strauss explained that Garcia was very nervous at trial, and in an effort to alleviate that, Strauss would sometimes "joke around with him." The court responded, "I'm just saying, it's a little bit distracting at times. Just be a little bit aware."

After the lunch break the same day, the trial court instructed Strauss, "[F]or security purposes, . . . don't go out to the audience during trial. Okay? It's a security thing." Strauss

indicated that he was meeting with Garcia's mother. The court reiterated, "[I]t's a security issue. That's all." Strauss stated that he would not "do it any more" that day.

Later that day, the court advised the jury: "I discussed some concerns that some jurors had regarding excessive talking during testimony. And that should stop. [¶] And I have also discussed about having loud conversations in the hallway in the presence of jurors. Okay? [¶] So thank you for letting me know. That shouldn't happen again. And if it does, you can just approach my clerk or my bailiff and I will handle it. Okay?"

During another break in the proceedings that day, Strauss asked the court to discharge Juror No. 7 for cause because the juror had complained and Strauss believed he was not fair and impartial. Strauss stated, in pertinent part: "And I will not let him determine how often I am going to talk to my client. [¶] He can't possibly hear me. I can't possibly distract him. He is closer to the witness than I am. [¶] And if he is not gone, I will drive him nuts by talking to my client whenever I feel like." The court declined to excuse the juror, finding he had done nothing wrong, and commenting, "I mean, with all due respect, Mr. Strauss, you are quite loquacious. You are a talker." The following exchange occurred between Strauss and the court:

"Mr. Strauss: That's none of his business when I am talking to my client.

"The Court: I don't think he is saying it is any of his business. He is saying that it was interfering with his ability to listen. [¶] And I've got to tell you, it interfered with my ability, too . . . ."

On April 12, 2022, Garcia refused to come to court and refused to take a COVID test. At the beginning of the morning

21

session, the court advised the jury, "Mr. Garcia is not here today. Don't draw any inferences from that. It's not evidence whatsoever."

At the conclusion of the afternoon session on April 12, 2022, outside the presence of the jury, the court noted for the record that Juror No. 7 informed the clerk that when he was in the court cafeteria at lunch, he heard Strauss talking "very loudly" and he overheard Strauss say why Garcia had not come to court that day. Strauss countered that he purposely sat away from the juror in the cafeteria while he was talking on the phone with his gang expert. He added, "We weren't talking about the case. I wasn't saying you know he is not guilty. Nothing about that." Strauss renewed his request for Juror No. 7 to be dismissed for cause. The court responded: "There is no indication that juror has done anything wrong. There is no indication that juror has broken his oath. [¶] I told you, also Mr. Strauss, that when you were talking to your client, it was actually interfering with my ability to concentrate, too." The court added, "And the juror actually voiced the same concern that I had." Strauss reiterated that he was not talking about the case in the cafeteria, and the court replied, "Nobody said you were talking about the case."

Later the same day, the court questioned Juror No. 7 outside the presence of the other jurors. The court asked him what he heard Strauss say about the reason Garcia was not in court the day before. Juror No. 7 responded, "I overheard that the defendant refused to take a COVID test."[6]

---

[6] In response to further questioning by the court, Juror No. 7 said he understood what he overheard was not evidence; he would be able to disregard it; he did not mention it to anyone

## 2. *Declarations in support of the petition to disclose juror contact information and motion for new trial*

Garcia submitted numerous declarations in support of his petition, including a declaration from his friend Christina Becerra, who stated, "There were many days I would see Mr. Strauss in the cafeteria at the courthouse during lunch hours. During this time, Mr. Strauss would be speaking on the phone or to other people very loudly about the facts of the case and continuously stated that he thinks his client was guilty in front of multiple jurors who were also in the cafeteria. In addition to this, I heard Mr. Strauss have these types of conversations on various occasions throughout the trial in front of jurors."

Garcia's cousin Jessica Rodriguez stated in her declaration that Strauss "was a huge distraction" in the courtroom because of his loud talking while court was in session. She added, "One time I became frustrated and told Mr. Strauss outside the courtroom that he was being so loud and distracting. Mr. Strauss said, 'I don't give a shit, this is my courtroom.' I felt embarrassed because there were jurors around us."

Madrigal's counsel Carlo Spiga also submitted a declaration in support of Garcia's petition. He stated, in pertinent part, "Mr. Strauss would regularly try to speak with me immediately outside the courtroom at a loud volume level and in the presence of jurors about matters that were inappropriate for the jurors to hear. It reached a point where I would go down the hall away from the courtroom because I was concerned that Mr.

---

other than the clerk; and he could remain fair and impartial. The court concluded there was no reason to exclude him.

23

Strauss was going to cause a problem with the jury." Madrigal's father stated in a declaration that Strauss's loud talking made it difficult for him to hear witness testimony.

In addition, in support of the motion for new trial, several individuals submitted declarations stating they observed Strauss sleeping during the trial, including Garcia and his aunt Evelyn Hernandez. Madrigal's father stated he observed Strauss sleeping "while trial was ongoing" on "at least three or four occasions." Garcia's aunt Elizabeth Oropeza stated she observed Strauss "appear[] to fall asleep at several different times while witnesses or experts were testifying." Madrigal's attorney Carlos Spiga stated he observed Strauss "sleeping during the trial and during witness testimony, including when the prosecution was presenting gang evidence against Mr. Garcia." Garcia's cousin Ashley Hernandez stated she observed Strauss "close his eyes during trial as if he was falling asleep."

Several persons also stated in their declarations that they observed Strauss looking at his phone. Garcia declared, "During the trial, Mr. Strauss would show me pictures of iguanas on his phone while witnesses were testifying." Garcia's sister Alexis Garcia stated she observed Strauss "playing Solitaire on his phone during the trial, even when there were discussions between the judge, prosecutor, and the codefendant's attorney." Garcia's cousin Ashley Hernandez stated she observed that Strauss "would tend to be on and off his phone throughout the trial while court was in session. Mr. Strauss was playing games on his phone (specifically Candy Crush) and also texting, which was very visible to see." Madrigal's father stated he observed that Strauss "was constantly on his phone during the trial. At least twice [he] observed Mr. Strauss playing Solitaire on his

24

phone while trial was ongoing." Garcia's grandmother Cecilia Oropeza stated that Strauss "played games on his phone while witnesses were testifying in court." Garcia's cousin Jessica Rodriguez stated she observed Strauss "playing Solitaire on his phone during opening and closing arguments." Madrigal's counsel stated he observed Strauss "playing games on his phone – including what appeared to be Solitaire or another card [g]ame – during the trial and during witness testimony."

Some of the declarants criticized Strauss's preparedness at trial. Madrigal's father stated he observed that Strauss "did not have any paperwork or reports or other documents on his desk throughout trial" and he "only witnessed [him] jot down a quick note once or twice." Garcia's grandmother Cecilia Oropeza stated she observed that Strauss "did not have any notes with him during trial." Madrigal's attorney stated that he never observed Strauss "take any notes during trial" or "with any discovery or access to discovery during trial." Garcia's friend Christina Becerra stated that she observed that Strauss "failed to refer to any paperwork while cross-examining witnesses."

Some of the declarants also stated that Strauss engaged in rude behavior. For example, Garcia's sister Alexis Garcia stated that Strauss "shout[ed] in front of jurors and the victim's family, 'I don't give a damn, they can kiss my ass,' which was humiliating for [her] entire family." Garcia's cousin Ashley Hernandez stated, "[T]here were many times that he would look back at the audience and roll his eyes." Garcia's aunt Evelyn Hernandez stated that when she and other family members approached Strauss about his distracting behavior in the courtroom, he would "curse at [them] in the courtroom and outside the courtroom in front of everybody that was around."

25

Madrigal's attorney Spiga stated in his declaration, among other things, "Off the record, Mr. Strauss said his goal was to make the case a circus and to cause a mistrial. It was my impression that Mr. Strauss was more interested in creating some sort of fiasco than in defending his client." He also stated, "In my professional opinion, Mr. Strauss provided legally deficient representation to Mr. Garcia that pervaded the entire case;" and "In my 29 years of practice as an attorney, I have never seen deficient representation to the level I observed with Mr. Strauss." Spiga also explained that he had "never previously written a declaration in support of a claim of ineffective assistance of counsel as to any attorney."

Garcia's counsel attached to the motion for new trial a letter he wrote to Strauss, asking him to respond to 37 questions about his representation of Garcia and his conduct. Strauss responded with a five-page letter. He denied ever falling asleep during trial or talking loudly during trial in a manner that could have made it difficult for jurors to hear witnesses' testimony. He acknowledged he occasionally talked to Garcia while testimony did not concern his case, indicating he was attempting to "humaniz[e]" him. He denied engaging in most of the rude conduct he was accused of, except that he admitted to cursing at one of Garcia's family members for reasons he explained. He stated that the only time he spoke loudly in the courthouse cafeteria about the case while jurors were present was when he was speaking with his gang expert "about scheduling and other unrelated things." He denied saying he believed Garcia was guilty while jurors were present. He also denied saying that his goal was to make the case a circus and cause a mistrial, but he acknowledged saying "the case was going to be a circus" because

26

of the way the prosecution was presenting its case.  He stated he did not speak with Madrigal's counsel in front of jurors about matters that were inappropriate for the jury to hear.

### 3. *Hearing*

The trial court held a hearing on the petition to disclose juror contact information and the motion for new trial.  In connection with the petition, the court noted that it had advised the jurors to bring any concerns to the court's attention, and no juror other than Juror No. 7 raised any concerns about Strauss's conduct.  The court also noted that none of the declarants approached the court about their concerns during trial, and the court questioned "the veracity" of the statements in their declarations.  Ultimately, the court denied the petition, finding Garcia did not establish a prima facie showing of good cause.

At the outset of the hearing on the motion for new trial, the court commented that Strauss "was a challenge for the court to handle.  He was loud, obnoxious, bombastic, rude and intemperate."

Turning to Garcia's claims, the court stated:  "In terms of whether or not [Strauss] was sleeping during trial, I am in a pretty good spot from where I am.  I didn't see it.  Although maybe I saw him close his eyes at one point.  But if that occurred, it was a fleeting moment.  It wasn't like, you know, a substantial period of time, based on my recollection.  [¶]  And I don't know how to distinguish somebody from closing their eyes and concentrating versus sleeping.  We can't make that distinction."

Regarding the claim that Strauss was playing games on his cell phone, the court stated:  ". . . I don't know.  You know, I didn't see it.  Nor could I see the screen of his phone, obviously.  [¶]  So I don't know what, if anything, he was doing on his phone.  I don't

27

know if he was showing pictures of iguanas to Mr. Garcia that's [*sic*] stated in the motion. [¶] I mean, during certain portions of the trial, Mr. Strauss, he vigorously argued on behalf of Mr. Garcia on a number of points." The court referenced Strauss's participation in a hearing under Evidence Code section 402. The court also noted that it observed Strauss write out his closing argument.

Garcia's counsel argued Garcia need not show prejudice because the deprivation of counsel was structural. Counsel asserted, "This was a problem that was so pervasive throughout the entire trial from start to finish that . . . you can't even assess the prejudice. . . . We just have to presume that the prejudice is there."

In addressing whether there was a deprivation of counsel, the court commented, "But I don't know when he was sleeping. At what stages. I don't know if it was critical. I don't know what percentage of time, for example." The court added, "But what I can tell you is he certainly wasn't sleeping through the entire trial. My ears were ringing for like two weeks after that, so, you know, he definitely participated in the trial." The court queried, "My concern is if he had been sleeping that much, how come I didn't notice it? [¶] I watch everything in here like a hawk." The court also questioned (1) how people who were sitting behind Strauss could see him sleeping, and (2) why Garcia, his friends and family, and Madrigal's counsel did not bring the issue to the court's attention during trial if they observed Strauss sleeping. Later in the hearing, the court stated, "Had I seen it [Strauss sleeping], I guarantee you I would have addressed it."

Garcia's counsel clarified that Garcia's "contention isn't that [Strauss] was sleeping through a substantial portion, but he

28

was sleeping through multiple portions of the critical portions of the trial.  Maybe it was just a few minutes here or there per witness, but that can be problematic.  That's not representation at that point."

Responding to Garcia's counsel's argument that Strauss's "general behavior in front of the jury . . . deprived Mr. Garcia of his due process right to a fair trial," the court stated:  "And the other issue is regarding what you are indicating about this pervasive negative influence that he [Strauss] had in the court and on the jury.  We don't know that's the case, obviously.  That's purely speculative that Strauss's conduct had a negative impact on the jury and, more importantly, affected their ability to objectively evaluate the evidence."

Ultimately, the court concluded there was no structural error because there was not "a complete denial of counsel at a critical stage of the proceedings" or a "complete" failure "to subject the prosecution's case to meaningful adversarial testing." The court commented, "I have handled very, very difficult attorneys from the bench here.  And again, there has to be a distinction made between one who is difficult and rude versus effective and/or ineffective.  So they are separate issues here.  [¶] And I understand . . . the family's frustration with Mr. Strauss.  I do.  I was frustrated with him, too, during the trial.  He was a challenge.  A challenge for me to manage."

Regarding ineffective assistance of counsel, applying *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), the court found Strauss's performance was deficient in calling a gang expert who, upon cross-examination, testified he was unaware of Garcia's juvenile adjudication for robbery with gang and firearm

29

findings.[7]  The court, however, concluded there was no prejudice in light of Garcia's incriminating statements about the murder during the *Perkins* operation and in his interview with detectives.

## E.    Sentencing

At the sentencing hearing for each defendant, the trial court dismissed the firearm enhancements under section 12022.53, subdivisions (b)-(e)(1), that a principal personally and intentionally discharged a firearm which proximately caused great bodily injury or death, given the court's prior dismissal of the gang enhancement allegations.

The court sentenced Madrigal to 25 years to life in state prison for the first degree murder and imposed a concurrent three-year term for the possession of a firearm by a felon.

At Garcia's sentencing hearing, Garcia asked the court to dismiss the firearm enhancement under section 12022.53, subdivision (d), that he personally and intentionally discharged a firearm which proximately caused great bodily injury or death, or impose a lesser firearm enhancement.  He argued that one of the mitigating circumstances enumerated in section 1385 required dismissal.  (§ 1385, subd. (c)(2)(C).)  We address the asserted mitigating circumstance below, in connection with Garcia's contentions on appeal.  The court declined to dismiss the

---

[7] The trial court did not make a finding as to whether it was "Strauss's fault" for failing to inform the expert of the juvenile adjudication or whether it was "the witness's fault" for not being prepared for his testimony in terms of knowledge of Garcia's criminal history.  The court found that either way, calling the expert was "problematic" and a "blunder" on Strauss's part.

enhancement, concluding for reasons stated on the record "that it would endanger public safety to dismiss it and that it's not in the interest of justice" to dismiss it.

The court sentenced Garcia to 50 years to life in state prison: 25 years to life for the first degree murder, plus a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

## DISCUSSION

<u>Garcia's Appeal</u>

### A. Garcia Has Not Demonstrated a Denial of His Constitutional Right to Effective Counsel Under a Presumed Prejudice Standard

Garcia asserts that the evidence supporting his motion for new trial compels a conclusion that he was deprived of his constitutional right to effective counsel because Strauss "spent critical portions of the trial either sleeping or playing games on his phone."  Based on this factual premise, he contends structural error occurred and therefore prejudice is presumed, requiring reversal of his murder conviction.[8]

"[W]here assistance of counsel has been denied entirely or during a critical stage of the proceeding," prejudice is presumed and a defendant need not show the "probable effect upon the outcome."  (*Mickens v. Taylor* (2002) 535 U.S. 162, 166.)  When such a denial of counsel has occurred, "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.  [Citations.]  But only in 'circumstances of that

---

[8] He does not argue ineffective assistance of counsel under the *Strickland* standard based on his claims that his counsel was sleeping and playing games.

31

magnitude' do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." (*Ibid*., citing *U.S. v. Cronic* (1984) 466 U.S. 648, 658-659, fn. 26.) "Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable," and "[n]o specific showing of prejudice [i]s required." (*Cronic*, at p. 659.)

In reviewing a claim of denial of effective assistance of counsel that was raised in a motion for new trial, we uphold the trial court's factual findings, express or implied, if they are supported by substantial evidence; and we have the " ' "ultimate responsibility . . . to measure the facts, as found by the trier, against the constitutional standard," ' " exercising our " 'independent judgment.' " (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

The trial court found that Strauss participated throughout the trial and argued on Garcia's behalf. These findings are supported by substantial evidence. Strauss presented an opening statement, he made evidentiary objections, he cross-examined the prosecution's witnesses, he called a witness in the defense case, and he presented a closing argument. Thus, Garcia has not demonstrated that Strauss was " 'either totally absent or was prevented from assisting [him during] a critical stage,' " or completely failed to test the prosecution's case. (*People v. Brown* (2014) 59 Cal.4th 86, 115.)

Citing federal court cases, Garcia argues that "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary." (*Javor v.*

*United States* (9th Cir. 1984) 724 F.2d 831, 833.) He also asserts that "sleeping counsel is tantamount to no counsel at all." (*United States v. DiTommaso* (2d Cir. 1987) 817 F.2d 201, 216.) He maintains that a presumed prejudice standard should similarly apply where an attorney plays games on his phone or is otherwise inattentive during critical portions of a trial. He cites no authority directly supporting this latter proposition.

In any case, the court's implied findings that Strauss was not asleep during trial, and that he was not otherwise distracted such that he failed to test the prosecution's case, are supported by substantial evidence. The record of the trial proceedings does not show that Strauss was ever asleep or distracted by his cell phone. And the trial judge stated he did not witness such conduct by Strauss and noted that no one had brought the issue to the court's attention during trial. Although the judge "maybe" observed Strauss close his eyes at one point for a "fleeting moment," he concluded he would have no way of determining whether Strauss was asleep or concentrating. Nor did the declarants provide an estimate of the length of time they believed Strauss was asleep or continually distracted.

Thus, the court did not err in rejecting this claim of denial of effective counsel and denying the motion for new trial.

## B. Garcia Has Not Established a Deprivation of His Sixth Amendment Right to Make Fundamental Choices About His Own Defense

Garcia asserts that evidence he presented in connection with his motion for new trial establishes that Strauss stated, while in the presence of jurors in the court cafeteria, that he thought Garcia was guilty. Garcia contends the asserted conduct

33

"violated [his] Sixth Amendment right to make fundamental choices about his own defense."

In support of this contention, he cites *McCoy v. Louisiana* (2018) 584 U.S. 414, 417, a case in which the trial court allowed trial counsel, over the defendant's vociferous objection, to tell the jury the defendant was guilty of three murders. The Supreme Court held, "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*Ibid.*) "[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id.* at pp. 417-418.) The "Sixth Amendment so demands." (*Id.* at p. 417.) Such a Sixth Amendment violation constitutes structural error that "is not subject to harmless-error review." (*Id.* at p. 427.)

We review de novo "a mixed question of fact and law that implicates a defendant's constitutional right." (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76 (*Ogunmowo*), citing *People v. Cromer* (2001) 24 Cal.4th 889, 901-902.) "We accord deference to the trial court's factual determinations if supported by substantial evidence in the record, but exercise our independent judgment in deciding whether the facts demonstrate" a violation of rights under the constitutional standard. (*Ogunmowo*, at p. 76.)

Garcia does not claim that in the courtroom Strauss informed the jury that Garcia was guilty of murder. Rather, he relies on a declaration from his friend Christina Becerra, who stated: "There were many days I would see Mr. Strauss in the

34

cafeteria at the courthouse during lunch hours. During this time, Mr. Strauss would be speaking on the phone or to other people very loudly about the facts of the case and continuously stated that he thinks his client was guilty in front of multiple jurors who were also in the cafeteria."

In denying the motion for new trial, the court made an implied finding that Strauss did not make a statement about Garcia's guilt in the courthouse cafeteria. This finding is supported by substantial evidence. In Strauss's letter responding to Garcia's new counsel's inquiry regarding his performance— which Garcia submitted as evidence in support of his motion for new trial—Strauss denied making the statements about Garcia's guilt. The trial court noted that it had instructed the jurors to inform the court if they heard anything about the trial outside the courtroom. No juror reported overhearing Strauss say Garcia was guilty, including Juror No. 7, who had reported other statements made by Strauss outside the courtroom.

Garcia has not demonstrated he was deprived of his Sixth Amendment right to make fundamental choices about his defense, and the trial court did not err in denying his motion for new trial on this ground. The evidence the trial court had before it at the time of the hearing on the motion for new trial—a hearing at which the court was permitted to make credibility findings, unlike at the prima facie stage of the petition to disclose juror contact information, as discussed in more detail below— does not establish that a member of Garcia's jury overheard Strauss say he thought Garcia was guilty.

35

**C.** **Garcia Has Not Demonstrated a Deprivation of His Constitutional Rights to an Impartial Jury and a Fair Trial**

Garcia asserts that evidence he presented in connection with his motion for new trial establishes that Strauss "consistently engaged in a number of distracting – and even antagonistic – behaviors throughout the trial." Garcia contends the asserted conduct deprived him of his constitutional rights to an impartial jury and a fair trial. He describes Strauss's behavior as (1) regularly engaging in loud conversation with Garcia during trial; (2) stating Garcia was guilty in front of jurors in the cafeteria; (3) making inappropriate comments about the case (Garcia's refusal to take a COVID test) and disparaging Garcia's family members in front of jurors outside the courtroom; and (4) engaging in other unprofessional conduct, such as rolling his eyes at the audience and speaking to audience members. He contends the error was structural and requires reversal.

"A criminal defendant's constitutional right to an impartial jury includes the guarantee of a jury that has not been subjected to improper influences, on which each member is capable and willing to decide the case solely on the evidence before the jury." (*In re Bell* (2017) 2 Cal.5th 1300, 1306.) In our inquiry, we "accord deference to the trial court's factual determinations if supported by substantial evidence in the record, but exercise our independent judgment in deciding whether the facts demonstrate" a violation of rights under the constitutional standard. (*Ogunmowo, supra*, 23 Cal.App.5th at p. 76; *People v. Miles* (2020) 9 Cal.5th 513, 602 (*Miles*).)

When the court became aware of problems with Strauss's behavior, it dutifully addressed each one. The court asked

36

Strauss to keep his voice down during witness' testimony. The court also instructed Strauss not to go out to the audience during trial. And the court questioned Juror No. 7 regarding what he overheard Strauss say about the reason Garcia did not come to court.

Further, as explained in the preceding section of this opinion, the record supports an implied finding that Strauss did not make a statement about Garcia's guilt in the courthouse cafeteria, and the finding is supported by substantial evidence. With regard to Garcia's assertions of other "distracting" and "antagonistic" behaviors by Strauss, the court concluded it was "purely speculative that Strauss's conduct had a negative impact on the jury" or "affected [the jury's] ability to objectively evaluate the evidence." We do not disagree.

Although we acknowledge that Strauss was "loud, obnoxious, bombastic, rude and intemperate," as the trial court found, we will not reverse the judgment based on speculation that jurors were improperly affected by Strauss's behavior.

## D. Garcia Cannot Demonstrate He Was Prejudiced By the Testimony of the Gang Expert His Counsel Called

Garcia contends Strauss rendered ineffective assistance by calling a gang expert and/or failing to advise the defense gang expert that Garcia had a juvenile adjudication for robbery with a gang finding; and he argues the asserted error was prejudicial under the *Strickland* standard.

As summarized above, Estevane testified on direct examination by Strauss that in his opinion, Garcia probably was not a "made trained gang member" at the time of the shooting, based on his lack of gang convictions, gang tattoos, and gang

37

contacts, among other factors. The trial court allowed the prosecutor to cross-examine Estevane about a gang-related juvenile adjudication, finding it was relevant to Estevane's opinion. On cross-examination, Estevane testified he was unaware Garcia had a sustained juvenile petition for robbery with gang and firearm enhancement findings. Ultimately, he testified that this new information, without more, would not change his opinion about Garcia's gang affiliation. The trial court gave the following limiting instruction: "This evidence about Mr. Garcia's prior criminal history has been admitted solely and only as it pertains to and impacts this witness's opinion as to whether or not Mario Garcia is a gang member. It's been admitted for no other purpose. You shall not consider that evidence for any other purpose."

To prevail on an ineffective assistance of counsel claim, a defendant must show: "(1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*), citing *Strickland*, *supra*, 466 U.S. at pp. 687-694.)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness

38

claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)  We have chosen to follow that course and dispose of this claim based on lack of sufficient prejudice.  Thus, we need not review the trial court's finding that Strauss's performance in calling the gang expert was deficient.

We presume the jury followed the limiting instruction and did not consider evidence of Garcia's criminal history for a purpose outside the scope of that instruction.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 725 (*Waidla*) ["The presumption is that limiting instructions are followed by the jury"]; *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 (*Franklin*).)  The jury was permitted to consider the evidence only as it pertained to and impacted Estevane's opinion as to whether or not Garcia was a gang member.  In light of the totality of the evidence against Garcia—the incriminating statements to the *Perkins* agent and the detectives, and the fact an eyewitness saw the shooter exit the alley right by Garcia's backyard—it is not reasonably probable that he would have obtained a more favorable result if the evidence had not been admitted for this limited purpose.

Garcia argues, "there is a reasonable probability that, in the absence of evidence of [his] criminal history, the jury – or even just one juror – would have been more likely to discard the *Perkins* statements as [his] attempt to impress – in Strauss's words – 'a more experienced gangster.' "  We disagree.  The incriminating statements to the *Perkins* agent have an indicia of reliability and trustworthiness, which is why they were properly admitted as declarations under interest under Evidence Code

39

section 1230, as we explain later in this opinion in connection with Madrigal's contentions.

Garcia next argues that even if the admission of the evidence of his criminal history "did not impact the question of identity, it is still reasonably probable that [it] impacted the jury's assessment of [his] mental state. . . . Consequently, having learned of Garcia's criminal history, the jury was much more likely to find that Garcia acted with premeditation and deliberation to support a finding that the murder was of the first degree." Again, we disagree. The evidence indicates Garcia fired shots toward the back of Diaz's body, began to walk away, and then turned around and fired more shots at Diaz. It is unlikely evidence of Garcia's juvenile adjudication is what convinced the jurors he acted with premeditation and deliberation.[9]

## E. The Trial Court Erred in Denying Garcia's Petition to Disclose Juror Contact Information

Garcia contends, contrary to the trial court's decision, that he did make a prima facie showing sufficient to establish good cause to disclose juror contact information. Although we agree the court erred in that regard, we nonetheless do not order the court to grant his petition. Rather, the court must follow the next steps as provided in Code of Civil Procedure section 237.

### 1. *The error*

" 'A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors.' [Citation.] 'Juror misconduct, such as the receipt of information about a party or

_____

[9] We reject Garcia's claim of cumulative error, based on his numerous claims regarding his counsel's conduct, because we have not found multiple errors to cumulate.

40

the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias.' [Citation.] Even a juror's 'inadvertent receipt of information that had not been presented in court falls within the general category of "juror misconduct." ' " (*Miles*, *supra*, 9 Cal.5th at p. 601, quoting *People v. Nesler* (1997) 16 Cal.4th 561, 578 (plur. opn.).)

"Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure." (Code Civ. Proc., § 237, subd. (b).)

"Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred. . . .' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) " 'Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight

41

evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.' " (*People v. Zamora* (2022) 73 Cal.App.5th 1084, 1091 (*Zamora*).) To make a prima facie showing of good cause for disclosure of juror information, the defendant is not required to introduce evidence "that juror misconduct actually occurred. Rather, the defendant simply has to prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493.)

Here, in ruling on the petition, the trial court questioned "the veracity" of the statements made in the declarations supporting the petition. At the prima facie stage, however, "the trial court must assume that the declarations supporting the motion are credible." (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1158.) Because the court may not make credibility determinations or weigh contrary evidence, our review at the prima facie stage is de novo. (See, e.g., *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 [whether a defendant made a prima facie case for resentencing relief under section 1172.6 is a "purely legal conclusion, which we review de novo"].)

Applying the assumption of credibility here, as we must, we conclude the statements in the declarations Garcia submitted establish a prima facie showing of good cause. According to Christina Becerra's declaration, on multiple occasions, she observed Strauss speaking "very loudly" in the courthouse cafeteria at lunchtime "in front of" multiple jurors, saying Garcia was guilty. Madrigal's counsel Carlos Spiga stated in his declaration that Strauss regularly approached him just outside the courtroom in the presence of jurors and tried to speak to him

in a loud volume "about matters that were inappropriate for the jurors to hear."

As the court acknowledged, Strauss's loud talking created problems during trial. And Juror No. 7 informed the court that he heard Strauss speaking very loudly in the courthouse cafeteria at lunchtime about the fact that Garcia was not in court that day because he refused to take a COVID test.

Accepting the statements of Becerra and Spiga, as we must, and considering Juror No. 7's statements to the court, it is reasonable to believe a juror received information about Garcia and/or the case that was not presented in the courtroom during the trial court proceedings (other than Juror No. 7's disclosure). This satisfies a prima facie showing of good cause as it is " 'a sufficient showing to support a reasonable belief' " that a juror received information that was not presented in court. (*Cook*, *supra*, 236 Cal.App.4th at p. 345.)[10]

The Attorney General argues that no juror other than Juror No. 7 informed the court about overhearing anything that Strauss said outside of the courtroom. But that is a consideration at a later stage of the proceedings, not at the prima facie stage.

Our conclusion here of a prima facie showing is not inconsistent with our conclusion that the record, as it stands now, does not establish a violation of Garcia's constitutional rights to an impartial jury and a fair trial to require the grant of the

---

[10] Based on our conclusion, we need not address Garcia's argument that a prima facie showing of good cause for release of juror contact information is also supported by statements in the declarations indicating Strauss "acted in an offensive manner in the presence of jurors."

motion for new trial.  The petition and motion for new trial are different proceedings with differing standards of review.[11]

## 2. *The remedy*

Garcia maintains that the appropriate remedy is to remand the matter to the trial court with directions to grant the petition. We disagree.  Although we agree that Garcia has made a prima facia showing, there are two more thresholds before entitlement to disclosure.  First, the court must determine whether a compelling interest against disclosure exists, and if it does then the court must deny the petition and make the required findings under Code of Civil Procedure section 237, subdivision (b).  If the court instead finds there does not exist a compelling interest against disclosure, it must hold an evidentiary hearing at which the prosecution may test the credibility of the defendant's evidence and present its own evidence, and jurors may appear and "protest" the granting of the petition.  (Code Civ. Proc., § 237, subd. (c); see *Zamora, supra*, 73 Cal.App.5th at p. 1091.)  If after an evidentiary hearing the court denies the motion, it must make findings as required by Code of Civil Procedure section 237, subdivision (d).

---

[11] Typically, a petition to disclose juror information is heard before a defendant files a motion for new trial because the reason for filing the petition is to obtain information to develop the motion.  In this case, however, the trial court heard the petition and the motion at the same hearing and was permitted to consider the credibility of the declarations in ruling on the motion but not the petition.

**F.      Sufficient Evidence Supports the Jury's Finding that Garcia Personally and Intentionally Discharged a Firearm, Proximately Causing Great Bodily Injury or Death**

Garcia contends the jury's true finding on the firearm enhancement allegation under section 12022.53, subdivision (d), is not supported by sufficient evidence.

We " 'review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.]  Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  We " ' "review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the [the firearm enhancement allegation to be true] beyond a reasonable doubt." ' " (*Ibid.*)

A firearm enhancement under section 12022.53, subdivision (d), requires a finding that the defendant "personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury . . . or death."  Garcia does not dispute the sufficiency of the evidence supporting the jury's finding that he personally and intentionally discharged a firearm during the commission of the murder.  He challenges the sufficiency of the evidence supporting the jury's finding that his personal and intentional discharge of a firearm proximately caused great bodily injury or death, arguing "the evidence does not point one way or another whose firearm was responsible for Diaz's injuries or whether both firearms were responsible."

45

A " 'proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred.' " (*People v. Bland* (2002) 28 Cal.4th 313, 335.)  The section 12022.53, subdivision (d), "enhancement applies so long as defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result" (great bodily injury or death).  (*Id.* at p. 338.)

Substantial evidence presented at trial, and reasonable inferences from that evidence, show the following:  There were two series of gunshots.  The man who fled on foot and not in a car after the shooting—i.e., Garcia—fired the second series of shots.  Diaz was walking away from Garcia when Garcia fired toward the back of Diaz's body.  Garcia started to leave and then turned around and fired more shots at Diaz.  After Garcia started firing, Diaz fell to the ground.  Garcia fired at least seven shots (based on the seven .45-caliber cartridge cases that were found closer to Diaz's body than the three nine-millimeter cartridge cases found near where Madrigal parked his car).  Five of Diaz's six entry wounds were on the back side of his body.  From this substantial evidence, the jury could make a finding beyond a reasonable doubt that Garcia's discharge of a firearm was a substantial factor contributing to Diaz's great bodily injury or death.

The cases on which Garcia relies in support of his challenge to the jury's proximate causation finding are inapposite.  In *People v. Botello* (2010) 183 Cal.App.4th 1014, the Attorney General conceded "the evidence was insufficient to prove that defendants personally used or discharged a firearm" where one

46

identical twin discharged a firearm, hitting the victim, and the other drove them away from the scene; and an eyewitness could not distinguish between the twins to say who was the shooter. (*Id*. at pp. 1018, 1022.) The issue in *Botello* was not the sufficiency of the evidence of proximate causation supporting the section 12022.53 firearm enhancement, as it is here, but rather the sufficiency of the evidence of personal use and discharge of a firearm. Here, Garcia does not dispute the sufficiency of the evidence demonstrating that he fired upon Diaz.

Garcia's reliance on *People v. Reyes* (2023) 14 Cal.5th 981 is similarly misplaced. There, the Supreme Court reversed the Court of Appeal's affirmance of the trial court's order denying the defendant's petition for resentencing under section 1172.6 after an evidentiary hearing. The Supreme Court disagreed with the Court of Appeal's conclusion that the evidence was sufficient to establish the defendant's guilt of second degree murder. (*Id*. at pp. 984, 986-987.) The prosecution proceeded on a theory that the defendant was *not* the person who shot the victim while the victim was driving a car and being chased by gang members (including the defendant) who were riding bicycles. (*Id*. at p. 988.) The Supreme Court concluded that the defendant's "acts of bicycling into rival [gang] territory and chasing after [the victim]'s car with [the actual shooter] and other fellow gang members were too attenuated in the chain of events to have proximately caused the killing; any causal link between [the defendant]'s conduct and [the victim]'s death is tenuous at best." (*Id*. at p. 989.) Here, in contrast, substantial evidence demonstrates that Garcia fired seven gunshots toward the back of Diaz's body, which was a substantial factor contributing to

47

Diaz's great bodily injury or death.  Sufficient evidence supports the firearm enhancement under section 12022.53, subdivision (d).

## G.    The Trial Court Did Not Err in Declining to Dismiss the Firearm Enhancement or Impose a Lesser Firearm Enhancement

Under section 1385, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  (§ 1385, subd. (c)(1).)  Section 1385 lists nine mitigating circumstances, each of which "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(2).)

Garcia contends that one of the nine mitigating circumstances applies here and requires that the firearm enhancement imposed under section 12022.53, subdivision (d), be dismissed.  He invokes subdivision (c)(2)(C) of section 1385, which provides, "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."

Garcia misinterprets the applicability of this mitigating circumstance.  On its face, subdivision (c)(2)(C) of section 1385 applies only when a sentence of over 20 years could result *because of the application* of the enhancement.  (See Couzens, Bigelow & Prickett, Sentencing California Crimes (The Rutter Group 2024) § 12:11, subd. (F)(3) ["There will be no entitlement to relief [under section 1385, subdivision (c)(2)(C)] unless it is the application of the term for the enhancement that results in a sentence longer than 20 years"].)

48

Here, the trial court could not have imposed a lesser sentence for the first degree murder than it did—25 years to life. (See § 190, subd. (a).)  Given that sentence, Garcia, a youth offender, is not "eligible for release on parole at a youth offender parole hearing" until his "25th year of incarceration."  (§ 3051, subd. (b)(3).)  Therefore, the *application* of the firearm enhancement here could not have *resulted* in a sentence of over 20 years, and Garcia is not eligible for relief under subdivision (c)(2)(C) of section 1385.  He cites no case indicating section 1385 forecloses imposition of a firearm enhancement on a first degree murder conviction, and we are aware of none.

Garcia's remaining arguments for dismissal or imposition of a lesser firearm enhancement relate to the manner in which the trial court made its finding that "dismissal of the enhancement would endanger public safety," under subdivision (c)(2) of section 1385.  The trial court need only make such a finding if it first finds one of the mitigating circumstances enumerated in subdivision (c)(2)(A)-(I) of the statute:  "Proof of the presence of one or more of these [mitigating] circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(2).)  Garcia only cites one mitigating circumstance and, as we have already concluded, it is inapplicable here.  Thus, the trial court was not required to make a finding regarding whether dismissal of the enhancement would endanger public safety, and we need not review the court's finding.

Garcia raises no other argument indicating it was in the furtherance of justice to dismiss the firearm enhancement under

49

section 1385.  We have no cause to order dismissal of the enhancement or imposition of a lesser firearm enhancement.

**Madrigal's Appeal**

**A.     The Trial Court Did Not Err in Admitting Statements Garcia Made During the *Perkins* Operation and the Police Interrogation**

**1.     *Perkins operation***

Madrigal contends the trial court erred in admitting into evidence against him Garcia's statements to the *Perkins* agent regarding the actions of an unnamed perpetrator of the murder. Madrigal argues the hearsay exception of declaration against interest under Evidence Code section 1230 does not apply, contrary to the trial court's conclusion, because Garcia's statements "inculpating" another perpetrator "were unreliably conflicting and purely self-serving."  Madrigal objected to the admission of this evidence below on the same ground.

"Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions."  (*People v. Grimes* (2016) 1 Cal.5th 698, 710 (*Grimes*).)  "Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness[12] may be admitted for its truth if the statement, when made, was so far against the declarant's interests, penal or otherwise, that a reasonable person would not have made the statement unless he or she believed it to be true.  ' "The proponent of such evidence must show 'that the declarant is unavailable, that the declaration

---

    [12] Garcia was unavailable, within the meaning of Evidence Code section 1230, as he could not be compelled to testify.

50

was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " ' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 704 (*Westerfield*).)

Our Supreme Court has "bar[red] admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others." (*Grimes, supra*, 1 Cal.5th at p. 715.) But the Supreme Court has "permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Ibid.*) "In short, the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not

51

have made the statement unless he believed it to be true.'" (*Id.* at p. 716.)

As our Supreme Court has explained, "A rule that permitted admission of no more of a declarant's statement than was necessary to expose him to criminal liability, requiring courts to mechanically sever and excise the rest, certainly might be easier to apply. But . . . this is not the rule we have: Under the law as it has developed in California, as in the federal system, context matters in determining whether a statement or portion thereof is admissible under the against-interest exception. This contextual approach accords with the rationales underlying the modern expansion of the rule governing the admission of statements against interest." (*Grimes*, *supra*, 1 Cal.5th at p. 717.)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*Grimes*, *supra*, 1 Cal.5th at p. 711.)

As summarized above, Garcia told the *Perkins* agent that the police arrested his "homie" about two weeks after the incident because of his [the "homie's"] car. Garcia then stated, "Yeah [unintelligible], it just happened [unintelligible] homeboy was around the area, that fool, fool was funny, not funny, but just coincidental, fool." He added, "spark homeboy, out of [unintelligible]. Homeboy cut him down." The agent asked if Garcia entered his "homie's" car, and Garcia said no, he ran away. Later, the agent asked Garcia what "the homie" was arrested for and Garcia indicated it was because of his car and because "he was there."

Madrigal contends the trial court abused its discretion in admitting Garcia's statements inculpating his "homeboy" as the

shooter, arguing the statements do not qualify as declarations against interest under Evidence Code section 1230.  Reviewing the statements in the context of the entire portion of the *Perkins* operation admitted at trial, we disagree with Madrigal's contention.

Garcia admitted to the *Perkins* agent that he was present at the scene, wearing a ski mask; that he ran from the scene after the shooting and was caught on camera; and that he got rid of a gun used in the shooting.  He described the crime as "[b]lasting a fool . . . from a distance."  When the agent followed up and asked him, "Did you hit him on the face or in the body," Garcia responded, "the whole shit."  Garcia also told the agent the reasons he did not want to admit to the crime were because officers did not "catch" him with a gun and he was wearing a ski mask (not that he was not there or did not participate).  Garcia implicated himself as a shooter.

Garcia also made numerous statements throughout the *Perkins* operation disclaiming any responsibility for the shooting and denying he was even at the scene.  When read in context, however, it appears he was rehearsing with the agent what he planned to tell the detectives.  For example, at one point, Garcia stated, "I wasn't even there," and "I had nothing to do with [it]."  The agent responded, "Hell, yeah," and "That's what you tell those [officers], homie."  Garcia continually asked the agent for advice on what he should say to the detectives.

In light of Garcia's numerous inculpatory statements to the agent, his statement that "Homeboy cut him down" was not too self-serving to be admissible.  Rather, it was a statement explaining how the crime unfolded—that there were two shooters

(which the evidence at the crime scene supports)—and explaining the role of each.

Madrigal relies on *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*) in support of his contention the trial court abused its discretion in admitting the evidence; but that case is readily distinguishable. There, one of three codefendants in a murder trial made statements to a jailhouse informant, giving multiple conflicting accounts of the defendants' respective roles in a shooting, and ultimately minimizing his role by stating he waited around the corner in a getaway car while one of his codefendants shot the victim from a vehicle driven by the other codefendant. (*Id*. at pp. 59-61, 73-76.)

Here, in contrast, Garcia indicated to the agent (1) that both he and his "homeboy" fired upon the victim, and (2) that he planned to deny responsibility when he spoke with detectives because officers did not find the gun he threw away and could not identify him as a participant because he was wearing a ski mask. These statements are an acceptance of responsibility and not too self-serving to be admissible. The trial court did not abuse its discretion in admitting Garcia's statements about his accomplice's role in the shooting as declarations against Garcia's interest under Evidence Code section 1230.

2. *Police interrogation*

Madrigal contends the admission into evidence (against Garcia only) of Garcia's statements to detectives regarding the actions of an unnamed perpetrator of the murder violated Madrigal's rights under the Confrontation Clause of the Sixth Amendment because the statements, on their face, incriminate him in the shooting. Madrigal objected to the admission of this evidence below on the same ground.

54

"Broadly stated, the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant." (*Gallardo, supra*, 18 Cal.App.5th at p. 68; *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. U.S.* (1968) 391 U.S. 123.)[13] The rule does not extend to a codefendant's statement that does not name the defendant and only becomes incriminating "when linked with" other evidence presented at trial. (*Richardson v. Marsh* (1987) 481 U.S. 200, 208, 211 (*Richardson*); *Samia v. United States* (2023) 599 U.S. 635, 647 (*Samia*).) In the latter case, the admission of the non-facially incriminating statement, coupled with a limiting instruction, does not violate the Confrontation Clause. (*Ibid.*) "[C]ertain obviously redacted confessions might be 'directly accusatory,' and thus fall within *Bruton*'s rule, even if they did not specifically use a defendant's name" (*Samia*, at p. 647), for example, "the 'red-haired, bearded, one-eyed man-with-a-limp.' " (*Gray v. Maryland* (1998) 523 U.S. 185, 195.)

Immediately before the prosecutor played the recordings of Garcia's interview with detectives, the trial court gave the following limiting instruction to the jury: "Lastly, the jury is instructed that Mr. Garcia's statement made to the police are [*sic*] admissible only against Mr. Garcia and not against Mr.

---

[13] The *Aranda/Bruton* rule applies only to testimonial statements, like Garcia's statements to detectives. It does not apply to nontestimonial statements, like Garcia's statements to the *Perkins* agent. (*Gallardo, supra*, 18 Cal.App.5th at pp. 68-69.)

Madrigal.  Do not draw any adverse inferences as to Mr. Madrigal from Mr. Garcia's statement."

The portion of Garcia's statement to detectives that Madrigal challenges is the following:  "[L]ong story short I was supposed to go take care of some shit and I, um, let homie into hitting me up, this and that, we're gonna kick it, like [unintelligible] this and that, we always kick it anyways.  So, we're gonna kick it and next you know that's when boom!  That shit happened right there.  Old boy was- he's been going around, around that time and it's only common sense.  And when the fucking homeboy just happened to be right there walking, that's when they did their thing.  And, you know, I- it's, like, I can't really say something 'cause you already know, it'll fall back on me, bro.  And, okay, I witnessed that, but it's, like, all right, I witnessed that . . . ."

Madrigal argues that the admission of these statements violated his rights under the Confrontation Clause because the reference to "Old Boy" *directly* implicated him in the incriminating statements.  We disagree.  This vague reference to an unidentified person is not facially incriminating or directly accusatory.  It is not even clear on the face of the statements that "Old Boy" was a perpetrator.  After the reference to "Old Boy," Garcia stated, "that's when *they* did their thing."  (Emphasis added.)  This indicates that some other people were the shooters.  The main point of these statements was that Garcia was calling himself a witness, not a perpetrator, in his interview with detectives; he was not identifying anyone by name or by implication.  It is only in conjunction with other evidence presented at trial that one could argue these statements are incriminating to Madrigal.  In light of the trial court's limiting

56

instruction, the admission of these non-facially incriminating statements did not violate Madrigal's rights under the Confrontation Clause.  (See *Samia*, *supra*, 599 U.S. at p. 647; *Richardson*, *supra*, 481 U.S. at pp. 208, 211.)

## B.  Madrigal Has Not Established Ineffective Assistance of Trial Counsel

Madrigal contends his trial counsel was ineffective under constitutional standards because counsel did not move to bifurcate count 2 (possession of a firearm by a felon) from count 1 (murder).

"Section 954 allows for the joint trial of 'two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 275-276.) "Because it ordinarily promotes efficiency, joinder 'is the course of action preferred by the law.' [Citation.]  'Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 689.)

As we discussed above, to prevail on an ineffective assistance of counsel claim, a defendant must show:  "(1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*Cunningham*, *supra*, 25 Cal.4th at p. 1003, citing *Strickland*, *supra*, 466 U.S. at pp. 687-694.)  In this instance, too, we have chosen to dispose of the ineffective assistance of counsel

claim based on lack of sufficient prejudice. (See *Strickland*, at p. 697.)

Madrigal cannot establish that there was a reasonable probability of a more favorable result on the murder count absent the admission of the evidence of the firearms and ammunition found during the search of his home. Madrigal told the detectives he did not lend his car to anyone on the evening of September 6, 2018, when the shooting occurred. Madrigal denied his car was at the scene of the crime. His car was captured on home surveillance cameras, speeding away from the crime scene. Eyewitnesses indicated the car left the scene sometime after the first series of gunshots concluded. Three nine-millimeter cartridge cases were located closer to where Madrigal's car was parked at the time of the shooting (based on eyewitness testimony) than they were to Diaz's body and the seven .45-caliber cartridge cases. Madrigal asked the *Perkins* agent if gunshot residue could have gotten on the outside of his car in a scenario where the shooting happened away from the car. Later, he explained to the agent where he parked his car in relation to where the shooting occurred. He also explained to the agent that his gang, San Fer, had problems "mostly" with Pacoima gangs. Diaz had a "P" tattoo on his face, indicating he had been a member of a Pacoima gang. Madrigal indicated to the agent that he and his fellow gang members confronted rivals who came into their neighborhood. After his arrest, Madrigal obtained a new tattoo across his torso stating "San Fer." The prosecution's gang expert testified that gang tattoos are earned by committing crimes for the gang. Given the strength of this evidence against him, we are confident the admission of the challenged evidence did not prejudice Madrigal under the *Strickland* standard.

58

Madrigal notes that he stipulated before the jury to an August 2011 conviction for possession of a firearm by a felon for purposes of count 2, and that this stipulation would not have been heard by the jury in his murder trial if the counts had been severed.  As he acknowledges, however, the trial court gave a limiting instruction, explaining to the jury that the stipulation "only goes to count 2" and was "only admitted for that very limited purpose and for no other purpose at all."  "The presumption is that limiting instructions are followed by the jury." (*Waidla*, *supra*, 22 Cal.4th at p. 725; *Franklin*, *supra*, 248 Cal.App.4th at p. 953.)  Madrigal cannot establish prejudice.

We reject Madrigal's claim of cumulative error.  He has not established multiple errors, so there is no error to cumulate.

## DISPOSITION

The judgment entered against Madrigal is affirmed.

The order denying Garcia's petition to disclose juror contact information is reversed, his sentence is conditionally vacated, and the matter is remanded to the trial court to proceed in accordance with Code of Civil Procedure section 237, subdivisions (b)-(d), consistent with this opinion.  In all other respects, the judgment entered against Garcia is affirmed.  The original sentence shall

be reimposed unless the court grants the petition to disclose juror contact information and then grants a motion for new trial.

NOT TO BE PUBLISHED


                                        M. KIM, J.

We concur:


          ROTHSCHILD, P. J.


          WEINGART, J.